IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

JAMES B. JONES,

      Plaintiff,

    v.                                                  Civil Action 2:17-cv-233
                                                      Magistrate Judge Jolson

COMMISSIONER OF SOCIAL
SECURITY,

      Defendant.

## OPINION AND ORDER

Plaintiff, James B. Jones, brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for a period of disability, disability insurance benefits ("DIB"), and supplemental security income ("SSI"). For the reasons that follow, the Court **OVERRULES** Plaintiff's Statement of Errors and **AFFIRMS** the Commissioner's decision.

### I. BACKGROUND

#### A. Prior Proceedings

Plaintiff filed for a period of disability, DIB, and SSI on June 8, 2015. (Tr. 16, PAGEID #: 53). In both applications, Plaintiff alleged a disability onset date of May 27, 2015. (*Id.*). His claims were denied initially on September 15, 2016, and upon reconsideration on January 8, 2015. (*Id.*). Administrative Law Judge Anne Shaughnessy (the "ALJ") held a hearing by video teleconference on September 15, 2016 (*id.*), after which she denied benefits in a written decision on December 12, 2016. (Tr. 16–25, PAGEID #: 53–62). Plaintiff sought review of the ALJ's decision, but the decision became final when the Appeals Council denied review on March 1, 2017. (Doc. 16 at 1–2).

Plaintiff filed this case on March 21, 2017 (Doc. 1), and the Commissioner filed the administrative record on May 30, 2017 (Doc. 11). Plaintiff filed a Statement of Specific Errors on August 11, 2017 (Doc. 14), the Commissioner responded on September 25, 2017 (Doc. 16), and Plaintiff did not file a Reply.

### B. Relevant Testimony at the Administrative Hearing

*1. Plaintiff's Testimony*

Plaintiff was born on December 27, 1974, and was 40 years old on the alleged disability onset date. (Tr. 23, PAGEID #: 60). At the hearing, Plaintiff testified that he is 6'4" tall and weighs 225 pounds and has a high school education. (Tr. 35, PAGEID #: 72). He lives alone, maintains a driver's license, and drives two to three times per week "if necessary." (*Id.*). Plaintiff worked full-time for thirteen years at National Freight Interactive Logistics in New Concord, Ohio. (Tr. 36, 46, PAGEID #: 73, 83). For ten years, he was "repack floor lead," making "Colgate Palmolive displays for local distributors all across the country…." (*Id.*). Thereafter, he was transferred to the position of "material handler," which he described as "shipping/receiving running equipment, and loading and unloading trucks." (*Id.*). Plaintiff served as a supervisor for "[u]p to 100 [people] at a time" while at National Freight Interactive Logistics. (Tr. 51, PAGEID #: 88).

Plaintiff suffered a back injury that led to a lower laminectomy in 2006, after he which he returned to work. (Tr. 36, PAGEID #: 73). Plaintiff explained that the associated pain returned at work approximately ten years later, in 2015, when he had to pick up "a bunch of product" that had spilled in a truck "and put it on pallets." (*Id.*). That injury led to a second laminectomy in August 2015. (Tr. 38, PAGEID #: 75).

Plaintiff also testified that, at fourteen years old, he broke his right arm "in 181 places,"

so it is "full of steel, screws, fake tendons and bands…." (Tr. 43, PAGEID #: 80). He indicated that there is "no bone" in his arm, which has "a 13 inch scar that [is] all metal." (*Id*.). Plaintiff testified that the range of motion in his arm recently has been "getting shorter and shorter." (*Id*.).

Plaintiff stated that he is in pain "[e]very second of his life," which is exacerbated by "[w]alking more than 10 to 15 minutes, sitting still in one spot without readjusting [him]self, [and] long car rides." (Tr. 40, PAGEID #: 77). Plaintiff testified that he "can sit 10 to 15… minutes without taking medication," and he constantly needs to readjust. (Tr. 41, PAGEID #: 78). Plaintiff takes a number of medications, which he explained "make[ ] it very difficult [for him] to function properly." (Tr. 37–38, PAGEID #: 74–75). Plaintiff reported sleeping very little due to the constant pain. (Tr. 42, PAGEID #: 79).

Plaintiff stated that he is able to lift two to five pounds (up to ten pounds) and uses a cane. (Tr. 39, 40, PAGEID #: 76, 78). Although Plaintiff sometimes walks without a cane at home, he always uses it to climb the stairs. (Tr. 46, PAGEID #: 83). Plaintiff explained that he is able to care for his personal needs using a shower chair and toilet seat extender. (Tr. 42, PAGEID #: 79).

Plaintiff testified that a friend visits him daily to help with chores, such as washing dishes, taking the garbage out, and driving places that are more than twenty-minutes away. (Tr. 38–39, PAGEID #: 75–76). A friend also takes him grocery shopping. (Tr. 44, PAGEID #: 81). Plaintiff explained that, on the rare occasion he grocery shops alone, he "drives a cart" to navigate the store. (Tr. 44–45, PAGEID #: 81–82). Plaintiff used to cook food on the grill, but now opts for food he can "throw … in the microwave." (Tr. 43, PAGEID #: 80).

### 2. *The Vocational Expert's Testimony*

Vocational Expert Mark Pinti (the "VE") also testified at the hearing. (Tr. 63, PAGEID

#: 100). The VE stated that Plaintiff's past jobs required medium and heavy levels of exertion and were semi-skilled. (Tr. 64, PAGEID #: 101). The ALJ asked the VE to consider a hypothetical individual with Plaintiff's past jobs who was limited to light work, can stand for two hours in an eight-hour workday, cannot climb ladders or scaffolds, can occasionally stoop, kneel, crouch, crawl, and can reach overhead with the right upper extremity. (Tr. 64, PAGEID #: 101). The VE testified that the individual would be unable to perform past work but could perform other work, such as assembler, inspector, document repairer, sorter, and order clerk. (Tr. 64–65, PAGEID #: 101–102). The VE likewise testified that if pushing and pulling with the right upper extremity were limited to occasionally, the hypothetical individual could still perform those jobs. (Tr. 65, PAGEID #: 102). In identifying these jobs, the VE "reduce[d] the exertional maximum to sedentary because of the standing and walking limitations…." (Tr. 64, PAGEID #: 101).

### C. Relevant Medical Background

*1. Medical Records*

Plaintiff's medical records reflect that he underwent surgery on his right elbow in 1986 (Tr. 554, PAGEID #: 591), and a lumbar laminectomy at L3-4 and/or L4-5 on the right side in 2006 (Tr. 429, PAGEID #: 466).

Dr. Richard P. Schlenk examined Plaintiff at the Cleveland Clinic on June 23, 2015. (Tr. 403, PAGEID #: 440). Dr. Schlenk observed Plaintiff walking with a normal gait and found his MRI results revealed "no severe canal or foraminal stenosis." (*Id*.). Dr. Schlenk opined that surgical intervention was unnecessary, instead concluding that Plaintiff "likely has chronic pain syndrome and should be referred to spine medicine specialists for further management." (*Id*.).

Neurosurgeon Michael B. Shannon made different findings just one month later, in July 2015. Dr. Shannon observed Plaintiff walked with an antalgic gait favoring the right leg and

4

found his MRI results showed foraminal stenosis at the L3-L4 level on the right side. (Tr. 439, PAGEID #: 476). Dr. Shannon opined that surgery was warranted and recommended a decompressive laminectomy. (*Id.*; *but see* Tr. 497, PAGEID #: 534 (noting that Dr. Shannon's first recommended Coflex, but switched to laminectomy after insurance denied the request)).

Dr. Shannon performed the surgery on August 12, 2015. (Tr. 440–41, PAGEID #: 477–78). Following surgery, Dr. Shannon reported that Plaintiff had "severe, severe lumbar spinal stenosis at L3-L4 with compression into the dura, almost perforation at the L3-L4 level." (Tr. 495, PAGEID #: 532). At a follow-up appointment with Dr. Shannon on December 3, 2015, Plaintiff had "fairly good range of motion, no paraspinal muscle spasm, good strength and reflexes." (Tr. 553, PAGEID #: 590). Plaintiff reported residual back pain, and Dr. Shannon advised him "to walk and exercise." (*Id.*). Dr. Shannon's notes from Plaintiff's follow-up visit on February 1, 2016, describe Plaintiff as "doing well" and having "no real complaints." (Tr. 552, PAGEID #: 589). Plaintiff demonstrated good strength, sensation, and reflexes, although again mentioned "some residual back pain." (*Id.*).

*2. Opinion Evidence*

Dr. Stephen Stansbury was Plaintiff's treating physician from February 27, 1984 through June 2, 2015. In June 2015, Dr. Stansbury opined that Plaintiff "is able to work." (Tr. 293–95, PAGEID #: 330–32).

Dr. Mark Weaver, a consultative examiner, examined Plaintiff on July 20, 2015. (Tr. 407–15, PAGEID #: 444–52). Dr. Weaver noted that the examination was prior to surgery that was "pending for [Plaintiff's] lower back." (Tr. 407, PAGEID #: 444). Dr. Weaver found that Plaintiff "walked with a stiffened gait and a right limp" and "us[ed] a cane on the right." (Tr. 408, PAGEID #: 445). He likewise noted that Plaintiff "was only able to sit or stand for about

10 minutes at a time in the exam" and was "complaining of low back pain." (*Id.*).

Concerning Plaintiff's elbow, Dr. Weaver observed that the "7-inch surgery scar" was "well-healed," although he found "tenderness and crepitus to palpation." (Tr. 409, PAGEID #: 446). As to Plaintiff's back, Dr. Weaver found "constant, moderate, involuntary spasm to inspection and palpation of the lumbar paravertebral muscles, right side greater than the left, and also in the sciatic notch area." (Tr. 410, PAGEID #: 447). Dr. Weaver determined that Plaintiff had restricted motion in the dorsolumbar spine. (*Id.*). Dr. Weaver reviewed, *inter alia*, the "MRI scan dated 6-5-15 showing mild foraminal stenosis at L3-4 and L4-5 and small annular tear at L4-L5." (*Id.*).

Dr. Weaver made two provisional diagnoses. (Tr. 411, PAGEID #: 448). First, Dr. Weaver found "[p]robable chronic right elbow pain and stiffness post compound fracture injury age 14 with reconstruction surgeries by medical history." (*Id.*). Second, Dr. Weaver found "[p]robable chronic low back and radicular right lower extremity pain, multi-level disc disease by medical history, mild foraminal stenosis at L3-L4 and L4-L5 with small annular tear at L4-L5 by MRI scan." (*Id.*). Dr. Weaver's assessment of Plaintiff's ability to perform physical activity was as follows:

> In view of his right upper extremity problems, low back and radicular right lower extremity problems with obligatory use of [a] cane for ambulation assistance, compounded by his problem of being overweight (BMI equals 30.4), [Plaintiff] would probably be limited in the performance of physical activities involving sustained sitting, standing, walking, reaching with right upper extremity, lifting, carrying, climbing, squatting, kneeling, and travel. He would probably be able to perform physical activities involving handling objects, speaking, hearing, and following directions.

(*Id.*).

On August 17, 2015, Dr. Teresita Cruz, a state agency medical consultant, found that Plaintiff was able to lift and carry 20 pounds occasionally and 10 pounds frequently. (Tr. 79,

6

PAGEID #: 116). She determined that Plaintiff could stand and/or walk for 2 hours and sit for 6 hours in an 8-hour workday. (*Id.*). Dr. Cruz found Plaintiff was limited his ability to push and/or pull with his upper right extremity and has postural limitations. (*Id.*).

Dr. Cruz opined that Plaintiff had an unlimited ability to climb ramps/stairs and balance, but should only occasionally stoop, kneel, crouch, and crawl. (Tr. 79–80, PAGEID #: 116–17). She found that Plaintiff should never climb ladders, ropes, or scaffolds due to his back and elbow conditions. (*Id.*). Plaintiff's sole manipulative limitation, according to Dr. Cruz, was his limited ability to reach overhead on the right. (Tr. 80, PAGEID #: 117). Dr. Cruz determined that Plaintiff was not disabled, offering the following explanation:

> You said you are disabled due to right elbow, multiple breaks, compound fractures, severe anxiety, heart palpitations, back surgery, lower laminectomy, arthritis, back sprains, high blood pressure, high cholesterol, insomnia, and sleep apnea. The medical evidence shows that you do have physical impairments that affect your ability to work. Your ability to lift and carry objects is limited, due to pain, discomfort, and loss of mobility. However, you do have good enough strength and movement to sit, stand, walk, and move about to complete some types of work. You may also experience some mental problems, [but] you are still able to think, communicate, act in your own interest and pursue your usual activities. We do not have sufficient vocational information to determine if you can perform any of your past relevant work. However, based on the evidence in the file, we have determined you can adjust to other work. Therefore based on social security guidelines we are not able to find you disabled.

(Tr. 82, PAGEID #: 119).

Dr. Leon Hughes, also a state agency consultant, affirmed Dr. Cruz's assessment on January 1, 2016. (Tr. 97–109, PAGEID #: 134–46). Dr. Hughes also opined that Dr. Weaver's more restrictive opinion was "less persuasive" because it was "without substantial support from other evidence of record." (Tr. 107, PAGEID #: 144).

### D. The ALJ's Decision

The ALJ found that Plaintiff met the insured status requirements of the Social Security

Act through December 31, 2020, and has not been engaged in substantial gainful activity since his alleged onset date of May 27, 2015. (Tr. 18, PAGEID #: 55). Although the ALJ found Plaintiff has severe impairments of spinal stenosis and a remote history of fracture of the right elbow, she determined that Plaintiff does not have an impairment or combination of impairments that meets or equals a listed impairment. (Tr. 18–20, PAGEID #: 55–57).

The ALJ found that Plaintiff retains the residual functional capacity ("RFC"):

> to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b) except that he is further limited to standing and/or walking for 2 hours in an 8-hour workday; never climbing ladders, ropes, or scaffolds; occasionally stooping, kneeling, crouching and crawling; occasionally reaching overhead with the right arm; and occasionally pushing and pulling with the right upper extremity.

(Tr. 21, PAGEID #: 58). The ALJ acknowledged that Plaintiff takes 6 Percocet per day and uses a cane on a daily basis. (*Id.* (citing Exhibit 14E)). The ALJ likewise recognized Plaintiff's testimony that, *inter alia*, "the pain is constant and prevents him from walking, standing, or sitting more than 15 minutes, or lifting more than 5 pounds." (*Id.*).

The ALJ found that, while Plaintiff's impairments could reasonably be expected to cause the alleged symptoms, Plaintiff's statements about the intensity, persistence, and limiting effects of these symptoms "are not entirely consistent with the medical evidence and other evidence in the record…." (Tr. 22, PAGEID #: 59). The ALJ noted that Plaintiff continued to work for ten years at a medium to heavy level of exertion despite his history of elbow surgery in 1986 and back surgery in 2005. (*Id.*). The ALJ also found that the progress notes after Plaintiff's second back surgery "show[ed] only a reduced range of motion and ongoing pain complaints, but otherwise … support a finding that the 2015 laminectomy was completely successful." (*Id.*).

As to the opinion evidence, the ALJ disregarded the opinion of Dr. Stansbury, Plaintiff's treating physician, that Plaintiff is able to work because it "was not a medical opinion, but rather

8

an opinion on an issue reserved for the Commissioner." (Tr. 22, PAGEID #: 59). In contrast, the ALJ gave "great weight" the opinion of Dr. Weaver, the consultative examiner, who opined that Plaintiff "would probably" be limited in activities which involve "sustained sitting, standing, walking, reaching with the right upper extremity, lifting, carrying, climbing, squatting, kneeling, and traveling." (*Id.*). The ALJ likewise noted Dr. Weaver's opinion that Plaintiff "probably would" be able to perform activities that involve handling objects. (Tr. 22–23, PAGEID #: 59–60).

Despite giving Dr. Weaver's opinion "great weight," the ALJ noted the opinion was offered one month prior to Plaintiff's second laminectomy so it did not reflect Plaintiff's post-intervention functionality. (Tr. 23, PAGEID #: 60). She also found Dr. Weaver's opinion to be "vague" and "equivocal" to the extent that it determined Plaintiff would "probably" be restricted. (*Id.*). Finally, the ALJ faulted Dr. Weaver's opinion for limiting Plaintiff's ability to sustain all functional activities, as opposed to offering specific vocational restrictions. (*Id.*).

The ALJ also gave "great weight" to the opinions of the state agency medical consultants, Dr. Cruz and Dr. Hughes. (Tr. 23, PAGEID #: 60). The ALJ noted that Dr. Cruz and Dr. Hughes offered the only opinions that considered Plaintiff's condition following his August 2015 surgery. (*Id.*; *see also id.* (noting that the evidence "after Dr. Hughes' assessment continued to show improvement," so Plaintiff "is not more limited than determined therein")). In conclusion, the ALJ stated that Plaintiff's RFC "is supported by the opinions of Drs. Cruz and Hughes and the progress notes showing that the August 2015 surgery was generally successful with good clinical signs." (*Id.*).

The ALJ found Plaintiff was a younger individual on the alleged onset date but subsequently changed to closely approaching advanced age. (*Id.*). She also found Plaintiff

9

unable to perform any past relevant work. (*Id.*). Based on the foregoing, the ALJ determined that Plaintiff has not been under a disability, as defined in the Social Security Act, from May 27, 2015 through her decision on December 12, 2016. (Tr. 25, PAGEID #: 62).

## II. STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)). "Therefore, if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

## III. DISCUSSION

Plaintiff alleges the following in his Statement of Errors: (1) there is no substantial evidence to support a finding that he can engage in substantial gainful activity; (2) the ALJ erred in finding that his testimony was not credible when it was consistent with the medical evidence of record; (3) the ALJ erred in finding that he retained the RFC to perform light work; (4) the ALJ erred in according more weight to the opinions of non-examining state agency consultants over the opinion of the consultative examiner; (5) the ALJ erred in failing to seek clarification from the consultative examiner; and the ALJ erred in failing to properly evaluate the assertions

of disabling pain. (Doc. 14 at 1–2).

The Court first examines Plaintiff's arguments concerning the ALJ's evaluation of his credibility and assertions of disabling pain. (Doc. 14 at 1–2). It is for the ALJ, and not the reviewing court, to evaluate Plaintiff's credibility. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007) (citing references omitted). However, the ALJ's credibility determination must find support in the record. *Id.*

Here, the ALJ noted that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but also found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (Tr. 21–22, PAGEID #: 58–59).[1] Relying on Plaintiff's medical records, the ALJ found that, aside from a reduced range of motion and ongoing pain complaints, progress notes following the surgery show that it was "completely successful." (*Id.*)

Consistent with the ALJ's decision, the record from Plaintiff's follow-up appointment with Dr. Shannon on December 3, 2015, demonstrates that Plaintiff had "fairly good range of motion, no paraspinal muscle spasm, good strength and reflexes." (Tr. 553, PAGEID #: 590). Although Plaintiff reported residual back pain, Dr. Shannon advised him "to walk and exercise." (*Id.*). Dr. Shannon's notes from another follow-up visit on February 1, 2016, describe Plaintiff as "doing well" and having "no real complaints." (Tr. 552, PAGEID #: 589). That day, Plaintiff demonstrated good strength, sensation, and reflexes, although he mentioned "some residual back pain." (*Id.*). The ALJ also relied on the opinions of state agency consultants Dr. Cruz and Dr.

---

[1] Under SSR 16-3p, which was effective on March 28, 2016, an ALJ must focus on consistency of an individual's statements about the intensity, persistence and limiting effects of symptoms, rather than credibility. *Compare* SSR 96-7p, 1996 SSR LEXIS 4, *with* SSR 16-3p, 2016 SSR LEXIS 4. While courts have disagreed as to whether the regulation applies retroactively, the Court need not resolve the issue because under either lens—credibility or consistency—the Court finds that the ALJ analyzed the record appropriately. *See Barncord v. Comm'r of Soc. Sec.*, No. 2:16-cv-389, 2017 U.S. Dist. LEXIS 151479, at *10–12. (S.D. Ohio June 30, 2017) (affirming recommendation that the Court need not resolve the retroactivity issue).

Hughes, which "took into consideration the post-surgical findings." (Tr. 23, PAGEID #: 60).

As noted above, Plaintiff alleges the ALJ erred in weighing the opinions of Dr. Cruz and Dr. Hughes because Dr. Weaver was the only medical expert who examined him and provided an assessment of his physical capacity. (Doc. 14 at 2). Plaintiff also contends that the VE's identification of sedentary jobs in response to the ALJ's hypothetical is contrary to Dr. Weaver's opinion that he should be limited in the performance of physical activities that involve prolonged sitting. (*Id*. at 11–12). Linking the VE's testimony to Dr. Weaver's physical exam findings, Plaintiff contends that the ALJ's decision is not supported by substantial evidence. (*See id*.).

This Court disagrees. Contrary to Plaintiff's argument, the ALJ considered Dr. Weaver's findings and gave them great weight to the extent that they concerned Plaintiff's condition a month prior to the August 2015 surgery. (Tr. 23, PAGEID #: 60). In other words, despite finding that Dr. Weaver's findings were well supported, the ALJ noted that those findings did "not reflect Plaintiff's degree of functionality post intervention." (*Id*.). For that reason, the ALJ looked to Dr. Cruz and Dr. Hughes, who offered their opinions after Plaintiff's surgery and found that Plaintiff was capable of performing a range of light work. (*Id*.).

The ALJ also found Dr. Weaver's opinions "limited due to the vague and equivocal nature of his findings" and because he "did not offer specific vocational restrictions." (*Id*.) (noting Dr. Weaver's finding that Plaintiff "would 'probably' be restricted" and limiting Plaintiff's "ability to sustain all functional activities"). Plaintiff counters that, "[i]f the ALJ felt that the opinions of Dr. Weaver were vague and equivocal, he should have sought clarification of those opinions by asking the doctor to opine in more vocationally specific terms." (Doc. 14 at 13–14). Because the ALJ had discretion to determine whether additional evidence was necessary to render a decision, she did not err in failing to seek clarification of Dr. Weaver's opinion. *See,*

*e.g.*, *Tracey v. Comm'r of Soc. Sec.*, No. 2:14-cv-1379, 2015 WL 4748009, at *11 (S.D. Ohio Aug, 12, 2015) (finding that "Plaintiff's contention that the ALJ had a duty to seek clarification" of a physician's opinion "is unavailing" because the ALJ only has a heightened duty to develop the record in limited circumstances).

Based on the foregoing, it is clear that the ALJ considered the record evidence including Dr. Weaver's physical exam findings and chose to assign great weight to Dr. Cruz and Dr. Hughes because their opinions represented Plaintiff's condition following his second laminectomy. Considering those opinions along with the record evidence, the ALJ ultimately concluded that Plaintiff is not disabled for purposes of the Social Security Act. Even if the Court were to accept that Dr. Weaver's opinion demonstrates Plaintiff's inability to perform the work identified by the VE, the ALJ's decision may not be reversed simply because record evidence supports a different conclusion. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1996). Because it is the ALJ's "function to resolve conflicts in the evidence, *see Hardaway v. Sec' of H.H.S.*, 823 F.2d 922, 928 (6th Cir. 1987)," and that is what the ALJ did here, the Court finds the decision supported by substantial evidence.

## IV. CONCLUSION

For the reasons stated, Plaintiff's Statement of Errors is **OVERRULED** and judgment is entered in favor of Defendant.

IT IS SO ORDERED.


Date: November 15, 2017                /s/ Kimberly A. Jolson
                                       KIMBERLY A. JOLSON
                                       UNITED STATES MAGISTRATE JUDGE